**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

UNITED STATES OF AMERICA

    V.                                   Case No. 5:16-CR-01263-33

ANA FIGUEROA

---

**DEFENDANT ANA FIGUEROA'S RESPONSE TO PRESENTENCE INVESTIGATION REPORT AND MOTION FOR DOWNWARD VARIANCE PURSUANT TO § 3553(A), § 3553(a)(6) AND 18 USC § 3582(c)(1)(a).**

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

       The Defendant in the above styled and numbered cause, Ana Figueroa, by and through her attorney, Silverio Martinez, files this her ***RESPONSE TO THE PSI REPORT MOTION FOR DOWNWARD VARIANCE PURSUANT TO § 3553(a), § 3553(a)(6) AND 18 USC § 3582 (c)(1)(A)*** and in support Ana Figueroa would show the Court as follows:

## I. BRIEF FACTUAL & PROCEDURAL BACKGROUND

       1.     Ana Figueroa is a young lady with no criminal history whatsoever. By the age of 2, Ana's parents divorced and her father abandoned her. At the age of 13, her mother was kidnapped and murdered. She moved to the United States and attended a private catholic school until she graduated. Her downfall, she admits, has been having married her childhood love whom, in retrospect, she <u>should</u> have known was up to no good.

       2.     In this case, Ms. Figueroa is charged in a multiple defendant drug offense/organization indictment. She is not implicated in any of the substantive drug offenses, rather, she was only brought into the conspiracy by virtue of the fact that she is the wife of one of the alleged top conspirators, Saul Romero. The allegations against Ms. Figueroa involve her

tacit acceptance of monies that were provided to her by her husband for the supposed purchase of her home.[1] There is no real supporting evidence to show that she ever participated in collecting monies, structuring deposits, delivering cash, or any other overtly criminal money laundering conduct. Nevertheless, she has pled guilty to the alleged offense of money laundering because she admits that she spent monies that she received from her husband in reckless disregard or conscious indifference as to the origins of said funds – conduct she recognizes is clearly within the money laundering statute.

3.      On February 3, 2020, Defendant entered a written plea of guilty before your honor, Judge Diana Saldana.

4.      On March 25, 2020, a presentence investigation report ("PSI") was filed by the United States Probation Department and it was revised on April 27, 2020. The PSI begins its "overview" by laying out the "Romero-Rojas Money Laundering/Drug Trafficking Organization ("MLDTO"). This "overview" describes the organization as complex, highly organized and sophisticated. It explains how the Romeros had "tentacles for this criminal organization expanding deep into the United States" and how the Romero family had "drug trafficking history since the 1980's and 1990's."

5.      While all of these aggravating background facts describe and explain the extent and sophistication of the Romero family, it says absolutely NOTHING about Defendant, Ana Figueroa. Regardless of how much the Government may want this Honorable Court to assume that Ms. Figueroa "must" have known all of this and been complicit in the drug trafficking organization, there just simply is no evidence. The only evidence in the Government file that led

---

[1] There are two other situations wherein Ms. Figueroa is alleged to have received or spent money that was obviously from illegal sources. However, these two other situations are negligible when compared to the monies alleged to have been involved in the purchase of that home in Laredo, Texas.

to Ms. Figueroa's acceptance of responsibility and plea of guilty is this: she was married to this admitted drug trafficker, she acknowledged and agreed to allow her husband to use her bank accounts to deposit money, and she spent money that she <u>should have known</u> had illicit origins considering the fact that her husband never held conventional gainful employment. However, to be clear, Ana never knew that her husband was a drug trafficker. Did she think he was lazy and that he was a "Junior"[2] or a "mantenido"? Absolutely. For this reason, as part of the plea negotiations in this case, the parties agreed that this Honorable Court should grant a downward adjustment for minor/mitigating role.

6.      On April 2, 2020, the Government filed an objection to said report acknowledging that Defendant's role in the offense was minor/mitigating such that a two-level mitigating role adjustment was agreed-to and is recommended. Furthermore, the Government agreed that Ms. Figueroa was free to argue for an even greater downward adjustment pursuant to this guideline provision.

## II.      <u>OBJECTIONS</u>

### <u>PARAGRAPHS 59, 60, 61 – New Dollar Amounts Never Before Disclosed</u>

7.      The PSI makes references in paragraphs 59-61 of $60,000.00, $68,000.00 and $76,110.00. Although presented separately for dramatic effect, all of these amounts are one in the same. In other words, the $60,000.00 are part of the $68,000.00 and the $68,000.00 are part of the $76,111.00. In paragraph 59, the PSI specifies that drug proceeds sent to Mexico via one of Ms. Figueroa's bank accounts was "over $60,000. Thereafter, in paragraph 60, the PSI makes reference to the "factual basis" in the plea agreement that specifies that the amount held between

---

[2] "Junior" is Mexican slang for wealthy children that leach off the success of their parents and/or that lack that spark of want that drives other children toward hard-work and success.

International Bank of Commerce (IBC) and Wells Fargo was "over $105,000 in unexplained cash or "illegal drug proceeds." Although the plea agreement does use the amount of $105,000, the government has only previously itemized deposits amounting to $68,000.00 (and of those $4,000.00 were not even cash deposits, as represented, but checks, see **Exs. 26-27**).

8.      Furthermore, in paragraph 61, the PSI lists three dollar-amounts that have never been produced to Defendant. Specifically, the amount of $36,722.07 is presumably an amount included in the $105,000 mentioned above (in paragraph 60) but it has never been itemized or otherwise detailed to Defendant in any evidentiary manner whatsoever. It was not until April 27, 2020, the date of the revised PSI, that this amount was even mentioned to this Defendant or her counsel. In addition, the $68,000.00 (which should be $64,000) are part of the $76,110.00 but the difference has never been accounted for or itemized to this Defendant. Again, this amount was first mentioned on April 27, 2020, the date of the revised PSI. Additionally, the $5,000 Bank of America amount has never been produced in discovery as part of any bank statement, financial statement, or otherwise. Defendants to all these three amounts as there is no way to counter assertions made for the first time on April 27, 2020.

**PARAGRAPH 62 – New Dollar Amounts Never Before Disclosed**

9.      In paragraph 62, the PSI makes reference to the Construction Scheme who, according to this paragraph received $312,000 on December 27, 2012, by and through a wire transfer directly from Saul Romero. This amount, however, has never been disclosed to Defendant in any way, shape or form. This amount is not supported by the facts, the evidence, or any other items disclosed or produced to Defendant during discovery. In fact, the only evidence

with regard to these numbers[3] and wire transfers shows the last transfer being for $25,000 on August 13, 2012, see **Ex. 3**.

REPORTE DE ANTICIPOS / TRANSFERENCIAS:

| No. | FECHA | TOTAL |
|---|---|---|
| 01 | 12/19/2011 | $ 77,200.00 |
| 02 | 01/11/2012 | $ 100,000.00 |
| 03 | 05/28/2012 | $ 100,000.00 |
| 04 | 06/18/2012 | $ 90,000.00 |
| 05 | 06/23/2012 | $ 25,000.00 |
| 06 | 07/02/2012 | $ 25,000.00 |
| 07 | 07/16/2012 | $ 25,000.00 |
| 08 | 07/20/2012 | $ 25,000.00 |
| 09 | 07/30/2012 | $ 25,000.00 |
| 10 | 08/03/2012 | $ 25,000.00 |
| 11 | 08/13/2012 | $ 25,000.00 |
| | SUBTOTAL: | $ 542,200.00 |
| | CHEQUE A GABRIELA: | $ 8,000.00 |
| | TOTAL: | $ 534,200.00 |
| | RETENCION DE 15% | $ 80,130.00 |
| | CANTIDAD A REGRESAR: | $ 453,890.00 |

*[handwritten notation: ← 500,000]*

## PARAGRAPH 63 & 64 – Mischaracterization of Dollar Amounts and Construction Deal

10.     In paragraph 63, the PSI refers to a "total of $750,000 in cash (illegal drug proceeds)." However, this amount has never been substantiated. The only amount that has ever been identified for Defendant is the amount of $542,200 which is mentioned later in that same sentence. Thus, Defendant objects to the inflated amount the Government now uses for purposes of going outside the plea agreement and adding unsubstantiated guideline points.

11.     Furthermore, Defendant objects to all of the facts as laid out in Paragraph 63 with regard to the sale of the residence located at 2610 Plantation East ("the Plantation Residence").

---

[3] These numbers were presumably produced by the builder, Nicolas Cardenas, and made discoverable by the Government.

According to the evidence produced to Defendant[4], Saul Romero paid a total of $542,200 to the builder/architect, Nicolas Cardenas. Additionally, <u>after four years of waiting</u> for Nicolas Cardenas to finish building the home, Defendant (and presumably her husband, Saul Romero too) became so tired of his excuses, antics, and general inability to finish the project, that she cancelled the sale and requested return of her investment. Because Cardenas had presumably used that money to build, albeit incomplete at the time, he agreed to pay it back and subsequently requested a promissory note to pay $520,000 in payments until the home sold to someone else. Of those $520,000, only $258,000 were actually eventually paid and only after the residence was sold. The rest remains due and owing under the Promissory Note signed by the parties. Additionally, the PSI makes reference to $60,000 of the monies paid back by Cardenas were paid into an "MLDTO business account identified as La Isla Fashion Group" but fails to identify the evidence that would indicate that this business is in fact "an MLDTO business." In fact, a cursory search of said business shows that it is a legitimate business that continues in operation to this date. See **Exs. 28A-28D.**[5] And then, farther down on Paragraph 63, the PSI makes reference to $142,000 paid to third parties when in fact the only evidence produced to Defendant was of $48,000 paid to third parties[6]. This amount is also inflated to aggravate the criminality of the case.

12.      As a result of all these transactions, this property was never transferred or sold to Saul Romero. Saul Romero and/or Ana Figueroa never owned this property. The property was

---

[4] Again, this evidence came from the information and evidence seized by the Government directly from Nicolas Cardenas. The numbers and figures are presumably, Nicolas Cardenas' calculations and accounting records. None of this was ever corroborated with actual account information from Nicolas Cardenas' bank accounts.
[5] Incidentally, Ana also had dreams like other people. She wanted to open up her own store and sell swimsuits to people. See **Ex. 28E.**
[6] According to the Government's own table, $48,000 was the "third party" payment and it was paid to a "Luis Armando Hernandez Soto." See **Ex. 23.**

sold in a valid and legitimate arm's length transaction to Eufracio Rodriguez and Laureen Muzza, and was in fact transferred with a lien. Neither Eufracio Rodriguez nor Laureen Muzza are related to Defendant. The only reason the Government alludes to this familial "relationship" is to cast the whole legitimate sale of this residence in a light of suspicion. The only reason this connection is even implied is because Defendant, after she was orphaned, was raised by her aunt (sister of her deceased mother) and her husband, who happens to have the surname, Muzza. Laureen Muzza is the daughter of Uncle Muzza's brother. Hence no familial relationship. Just an acquaintance.

13.     To illustrate how the purchase of the Plantation Residence is mischaracterized and cast is the worst light for purposes of attributing a criminal aspect to it that didn't exist, it is important to understand the sequence of events that led to the transactions for the purchase of that home. They transpired as follows:

**The Plantation Residence Transaction (with supporting documentation)**

14.     First of all, the real property and improvements located at ("the Plantation Residence") were never transferred to Mrs. Figueroa or Saul Romero such that either of them could agree to forfeit. As described below, at no time did Figueroa own the real property and/or the final improvements constituting the Plantation Residence. The evidence is overwhelming on this issue, see **Exs. 1-19.**

15.     All the $258,000.00 paid on the $520,000 promissory note, other than those paid to third parties, were deposited in Wells Fargo, Account Ending *8043*, see **Ex. 23**. It is from this same account, that $103,000.00 in attorney fees mentioned in Paragraph 64 were paid. See **Exs. 24 and 29.**

*A.  The Fernandezes and Nicolas Cardenas*

16.     Nicolas Cardenas was married Daniela Fernandez but divorced on August 30, 2019. See **Ex. 19**. Nicolas Fernandez is the principal of Nicolas Cardenas Design Studio, Inc. ("NCDS") Throughout their marriage, because of lack of capital and/or credit issues, Nicolas Cardenas could not purchase real property or finance his own construction projects. Instead, Mr. Cardenas and/or NCDS would rely on the monies of Javier and Maria Fernandez ("the Fernandezes"), Daniela's parents. However, Mr. Cardenas engaged in a systematic course of action where he would simply not pay the Fernandezes back for their investments. As a result, as of December 2019, Nicolas Cardenas and/or NCDS owed the Fernandezes approximately $ 2,200,000.00 (including $401,316.75, in relation to the 2610 Plantation Residence). See **Ex. 10**.

### B.  The Fernandezes and The Rodriguezes

17.     The Fernandezes, including Daniela, have known Eufracio Rodriguez and his wife, Lauren ("the Rodriguezes") prior to their purchase of the Plantation Residence. For example, in 2014, the Fernandezes, including Daniela, sold real estate to the Rodriguezes in the Alexander Estates Subdivision in Laredo, Webb County, Texas. See **Exs. 20-22.** Thus, the Rodriguezes' purchase of the Plantation Residence was not a sham or part of any "scheme" to launder money, but rather another transaction carried on between two parties that were used to doing business. This transaction did not include Defendant in any way, shape or form.

### C.  The Plantation Residence

18.     The Fernandezes (via Fernandez Real Estate, LLC) originally purchased the real property located at 2610 Plantation East Drive on or about January 28, 2008. See **Ex. 1**. In 2011, as with numerous other properties and other clients, NCDS, through Nicolas Cardenas, contracted with Ana Figueroa for the construction of a residence. **Ex. 2**. Throughout the construction of the residence, Mr. Cardenas requested payments or *draws* for the construction

and payments were made. See **Ex. 3**. However, for a variety of reasons, Mr. Cardenas and/or NCDS did not and/or could not finish the construction with the allotted budget. During the same time period, Mr. Cardenas was asking the Fernandezes for monies for construction of the same residence. Nevertheless, the construction on the residence came to a stop and remained stopped for some time.

19.     After the construction stopped, in 2014, the Fernandezes, as owners of the underlying real estate and, in their mind, the lenders on the construction, transferred the real estate and the incomplete improvements from Fernandez Real Estate, LLC, to themselves individually, see **Ex. 4**. Three days later, the real estate was transferred from the Fernandezes to FER R.E., Ltd., a limited partnership. See **Ex. 5**.

20.     On or about July 11, 2016, the Rodriguezes entered into an earnest money contract to purchase the Plantation Residence, paid $10,000.00 in earnest money (which was deposited with Neel Title Corporation). In addition, the Rodriguezes paid $190,000.00 to NCDS. See **Exs. 6-7**. The proposed sales price was $742,000.00 not $900,000. See **Ex. 6**. However, at the time of the earnest money contract, title to the real estate and all improvements remained under FER R.E., Ltd., not NCDS. The original closing date was on or before August 8, 2016. See **Ex. 6**.

21.     On August 8, 2016, the title still remained under FER R.E., Ltd., and, as a result, the closing was moved to August 15, 2016. See **Ex. 8**. In the interim, in exchange for a promissory note in the amount of $401,316.75, see Ex. 10, FER R.E., Ltd. transferred the Plantation Residence to NCDS, see **Ex. 9**. In addition, NCDS entered into a promissory note with Ana Figueroa for $520,000.00 to reimburse her for the *draws* or advances made toward the construction of the Plantation Residence. See **Ex. 11**. In total, unbeknownst to Figueroa or the

Fernandezes, NCDS owed $921,316.75 relating to the Plantation Residence at the time of closing and even at the sales price of $742,000.00 (*assuming* that Nicolas Cardenas would actually use 100% of the sales proceeds to pay toward the debt), Figueroa and/or the Fernandezes would still be owed approximately $179,316.75.

22.     At closing, NCDS received another $97,330.11. See **Ex. 12**. In total, NCDS received approximately $287,330.11, in relation to the sale of the transaction. Of these monies, $250,000.00 was distributed to Figueroa, see **Ex. 17**, and none was paid to the Fernandezes or FER R.E., Ltd. Mr. Cardenas and NCDS kept $37,330.11(in other words, again, as he has on numerous other properties and projects, Mr. Cardenas did not pay the Fernandezes). The remaining amount due by the Rodriguezes for the Plantation Residence was to be paid pursuant to a promissory note in the amount of $442,000.00. See **Ex. 15**. The first payment of $33,000.00 was due in December 2016. However, in October 2016, the United States of America filed its *Notice of Lis Pendens* and thereafter no payments were made under the promissory note.

23.     In February and/or March 2019, the Rodriguezes and NCDS discussed entering into an Escrow Agreement in relation to the promissory note. See **Ex. 18**. Initially, both parties thought the forfeiture issue would be resolved promptly but, since that was not the case, alternate solutions were considered. Figueroa had nothing to do with this Escrow Agreement because she is not the owner of the Plantation Residence.

24.     In sum, as is apparent from the exhibits attached hereto and the amount of time it took (at least four years) to turn around only a portion of the amounts totally paid into the Plantation Residence by Defendant – using her husband's money, of course – that this transaction was not meant to be a typical money laundering scheme. The question is, who would attempt to launder their money by investing it in a construction project that (1) never gets

finished, (2) delays the return of the investment for four years, (3) includes haggling back and forth with a reticent construction contractor, and in the end (4) results in only a fraction of the money being returned or "laundered"?

25.     The bottom line is this was not a laundering project by Ms. Figueroa. It may have been an indirect way to launder money for Saul Romero but this cannot be attributed to Ms. Figueroa. Although she admits, as her plea factual basis demonstrates, that she should have known that the cost of the Plantation Residence was too high for her unemployed husband, she just didn't ask where he was getting his money. She turned a blind eye and she ignored the tell-tale signs of criminal activity. However, this doesn't change several facts – (1) the plea agreement limits her monetary amount involvement, (2) the PSI numbers go beyond that limit, (3) the Government's numbers are inflated and double counted.[7]

## PARAGRAPH 65 – Defendant is portrayed in an unfair light

26.     Defendant objects to PSI Paragraph 65 inasmuch as this paragraph portrays her as having a hands-on approach to her husband's money laundering or drug trafficking schemes. As stated above, Defendant pled guilty and accepts responsibility herein because she realizes that she SHOULD HAVE KNOWN or at least suspected that her husband was making money from illegitimate sources. However, as a married Mexican woman who doesn't work, she never asked her husband what he did or how he made money. In fact, she has been consistent in her position that although she, at times, questioned her father-in-law's occupation, businesses, and/or associations with other businesses, all she knew was that he supported his two sons and employed them in his business dealings when necessary. She found it customary for Mexican

---

[7] A perfect example of double counting dollar amounts is the following: the money that is listed on Paragraph 64 of the PSI as payments to lawyers was the same monies that was used and received from NCDS and the construction

fathers to support their sometimes lazy and worthless children. Furthermore, when those parents were well-off, this support was, many times, more than for living necessities. But to say that she deliberately conspired to open accounts, make transfers, conceal and/or structure deposits, is an overstatement. One can allude to the fact that this only "makes sense" and that we all "know" (wink wink) that she knew but there just isn't any evidence to that effect. In fact, if the government argues that Defendant and her drug-trafficking husband lived in luxury and enjoyed a lavish lifestyle, the file is bereft of any photographs of luxury vehicles, expensive jewelry, private airplanes, or other such obvious luxuries.

27.     The only evidence that the Government has in this case against Defendant is the following:

| EVENT | AMOUNT USED | METHOD |
|---|---|---|
| Defendant's husband buys her a home in Laredo, Texas | **$520,000**<br><br>**($258,000 –** returned by NCDS to D**)** | After four years of haggling with contractor, Defendant requested a refund – only half (appox. $258K) was returned by contractor |
| Defendant pays attorney fees for brother-in-law when arrested | $ $103,000 | That amount corresponds in time and constitutes money received from NCDS as refund payment on construction project. (Same Funds) |
| Defendant receives money in her bank accounts that are subsequently retrieved in Mexico by unknown subjects | **$117,832.07** (assuming Government's numbers are 100% correct – which they are not) | Saul Romero is on recording instructing cohorts to deposit into her account. No evidence of Defendant ever acquiescing or knowing. |

**PARAGRAPH 78 – Base Offense Level is a Breach of the Plea Agreement**

28.     The PSI clearly takes into account the fact that the written plea agreement, as signed by the defendant, holds her accountable for more than $250,000 but no more than

---

project. See Ex. 29. The PSI inflates the amounts of the construction project and then it re-counts the amounts paid to lawyers as if it were separate monies laundered.

$550,000 in laundered drug trafficking proceeds. As such, accepting the PSI's base offense level would result in a breach of the agreement that induced a plea in this case. The Fifth Circuit has clearly stated that "[w]hen interpreting plea agreements, [the court] applies general principles of contract law." *United States v. Herrera-Alvarado*, 732 Fed.Appx. 285 (5th Cir. 2018). "To determine whether the terms of the plea agreement have been violated, [the court] must consider 'whether the government's conduct is consistent with the defendant's reasonable understanding of the agreement." *Id*. "Both express and implied terms should be considered. *Id*. "The plea agreement is construed strictly against the Government." *Id*.  In this case the plea agreement states that "the United States agrees to recommend (and the defendant stipulates) the Court hold the defendant accountable for more than $250,000 but less than $550,000 in laundered drug proceeds for purposes of calculating [the] Base Offense level under U.S.S.G. This would make the Base Offense Level in this case a **Level 8.**

**PARAGRAPH 83 – Adjustment for Role in the Offense**

28.     Again, in this paragraph the PSI writer attempts to have this Honorable Court disregard the provisions of the agreed-upon plea. Interestingly, however, the PSI acknowledges that it is disregarding any sort of agreement explicitly laid out in the Plea Agreement and goes further to argue to the Court its take on the evidence and whether the writer believes Defendant's role "merits" a role adjustment. Without being familiar with either the facts or the complexities of the construction transaction that took place for the sale of the Plantation Residence, the writer argues that "the builder returned the 'legitimate' monies generated from the sale of the home to Saul Romero. These are all very inaccurate statements of both fact and law that the PSI writer is, with all due respect, not competent to make. The amounts are wrong and the statements are wrong. As such, Defendant respectfully requests that, not only the two-

point downward adjustment recommended by the Government be granted, but further, that this Court grant an additional 2 levels for Defendant's minor role.

## OBJECTIONS CONCLUSION

29.     The foregoing objections are made for several reasons, which, if this Honorable Court follows the plea agreement of the parties, will not amount to a substantial difference in offense sentencing guideline scoring. Nevertheless, just as the goal of the PSI writer seems to be to cast Defendant in the worst, most sinister light, the goal in making these objections and pointing out the inaccuracies is to show to this Honorable Court the mitigating nature of the manner in which these events occurred and how it could have easily been overlooked by Defendant. Furthermore, the foregoing objections are also intended to lay the foundation for the following respectful requests for a substantial downward variance and/or split sentence.

## III.     ARGUMENT & AUTHORITIES

### MOTION FOR SENTENCE OUTSIDE GUIDELINES PURSUANT TO § 3553(A) AND (A)(6)

30.     The United State Supreme Court's post-*Booker* caselaw has made clear that sentencing courts must consider, in addition to the Guidelines promulgated by the United States Sentencing Commission, the factors set forth in 18 U.S.C. §3553(a). These include, broadly, "the nature and circumstances of the offense and the history and characteristics of the defendant," the purposes of sentencing, and, as relevant here, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court outlines the "*double determination*" required of sentencing courts and the Sentencing Commission, noting that each has an *independent* obligation to ensure that sentencing outcomes are consistent with § 3553(a). *Id*. at 347 (emphasis added). The Court noted that the sentencing judge "may hear

arguments by prosecution or defense that the Guidelines sentence should not apply . . . perhaps because the Guidelines sentence itself fails property to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Id*. at 351. Whether or not the sentencing judge decides to vary from the advisory Guidelines range, however, the Supreme Court has left no doubt that the sentencing regime promulgated by Congress and elucidated by the it's precedents requires the district court to conduct an individualized assessment of the defendant and the application of each of the § 3553(a) factors to her case, including the need to avoid unwarranted disparities between the defendant and similarly-situated offenders.

31.     In this case, even if this Honorable Court were to grant an additional 2-level downward adjustment for role in the offense, as requested by Defendant, a sentence at level 21 (37-46 months) *creates*, rather than avoids, an unwarranted disparity among sentences of similarly situated defendants. *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). The sentencing issue raised by this case is especially important in its implications for uniformity of the law and fair sentencing practices among the federal courts and defendants sentenced for similar crimes. There have been a series of empirical studies since *Booker*. A study first conducted in 2010 and revised and updated through August 2016 analyzed sentences imposed on *remand* after Guidelines sentences had been vacated on appeal for failure to consider the defendant's non-frivolous § 3553(a) arguments. See Jennifer Niles Coffin, *Where Procedure Meets Substance: Making the most of the Need for Adequate Explanation*[8]. The Study found that 58.1% of sentences imposed on remand were less severe than the within-Guidelines range

---

[8] This Study is available at *the following address* https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/sentencing_rescources/where-procedure-meets-substance-making-the-most-of-the-need-for-adequate-explanation.pdf (the "Study").

sentence original imposed. *Id.* at 18.[9] Thus, district courts' mandatory consideration of the §

3553(a) factors has important, real-world consequences: In a majority of cases, it results in a less

severe sentence than is imposed where courts blindly follow the Guidelines.

32.     It is perhaps unsurprising that this is the case since numerous factors that are

considered not relevant or not ordinarily relevant to sentencing under the Guidelines have been

repeatedly deemed by courts to be highly relevant to their consideration of the personal history

and characteristics of the defendant and whether the sentence is sufficient or greater than

necessary to serve the purposes of sentencing. The real-world experience of sentencing judges

reflects that factors they consider highly relevant – and that Congress had the wisdom to include

in their sentencing determinations – are left out of the Guidelines calculations entirely.

33.     Sentencing disparities under 18 U.S.C. § 3553(a)(6) are such a factor. Ten of the

cases cited in the Study turned on the district court's initial failure to make an individualized

assessment of each defendant and consider him *vis a vis* similarly-situated defendants, and in

each of these cases, the district court on remand imposed a lesser sentence when it explicitly

considered the need to avoid unwarranted disparities. See Appendix.

34.     In *United States v. Friedman*, 658 F.3d 342 (3d Cir. 2011), for example, the

defendant was convicted of bribery with two co-defendants – the public official to whom the

bribe was paid and another individual who paid the same official a bribe. *Id*. at 363. Those co-

defendants were sentenced to 24-months' imprisonment and three years' probation, respectively.

*Id*. The district court imposed a Guidelines sentence of 34 months without meaningfully

addressing the defendant's argument that such a sentence would create an unwarranted disparity

---

[9] That percentage was even higher – 73.7% - for non-Guidelines sentences, though that category represented a
smaller sample size. *Id*.

with the sentences his co-defendants received. See *Id*. ("The District Court's only discussion of this alleged disparity in sentencing was that the District Court noted that it was required to 'consider a fairness with regard to other offenders who are sentenced by the Court.'"). The Third Circuit held this was procedural error, stating that "[t]he District Court must address whether there is a sentencing disparity because there is no explicit discussion or indication in the record that it was considered." *Id*. On remand, the district court resentenced the defendant to 24 months.

35.     In *United States v. DeYoung*, 571 F. App'x 231 (4th Cir. 2014) (unpublished per curium op.), the defendant was convicted of conspiracy to distribute and to possess with intent to distribute oxycodone. *Id*. at 232. At sentencing, she requested that the district court give her the same benefit of a reduction in drug weight that the government recommended for her co-defendant at his sentencing hearing. *Id*. at 234. The district court rejected that request and sentenced the defendant to the bottom of the advisory Guidelines range, imposing a sentence of 70 months' imprisonment – the same sentence received by the co-defendant. *Id*. The Fourth Circuit held that although the defendant's sentence was within the Guidelines range, the sentencing "court erred by ignoring her nonfrivolous arguments for a different sentence and failing to explain the sentencing choice," and that the outcome of this error was that "[w]hile the co-defendant was more culpable, he received the same sentence." *Id.* (internal quotation marks omitted). As in *Friedman*, the Court of Appeals found this was "procedurally unreasonable," *id*. at 233, and remanded for resentencing. On remand, the defendant received a sentence of time served, which at that time was 15 months.

36.     The foregoing cited cases – and other contained in the Appendix, *infra* – support the commonsense notion that when district courts consider all the relevant factors to sentencing,

including the need to avoid unwarranted disparities, the sentences imposed are less harsh, more equitable, and fairer overall. When courts consider all of the § 3553(a) factors in addition to calculating the Sentencing Guidelines, they fulfill their statutory role of imposing punishments that are sufficient, but not greater than necessary, to achieve the purposes of sentencing.

37. Thus, in this case, the line of precedents since *Booker* requires individualized sentencing to advance the goals of fairer sentencing practices that appropriately treats similarly situated defendants alike and those with varying levels of culpability differently. The foregoing authorities as well as those cited in the Appendix below clearly show that 18 U.S.C. § 3553(a) unequivocally states that courts, "in determining the particular sentence to be imposed, *shall consider* . . . the need to avoid unwarranted disparities among defendants." 18 U.S.C. § 3553(a)(6) (emphasis added). The mandatory language has prompted the United States Supreme Court to hold that "[t]he Act *requires* judges to consider" the § 3553(a) factors, including "the need to avoid unwarranted sentencing disparities." *Booker*, 543 U.S. at 259-60 (emphasis added) (internal quotation marks omitted); see also *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) ("Section 3553(a)(6) *directs* district courts to consider the need to avoid unwarranted disparities." (emphasis added)).

38. The U.S. Supreme Court has never held that sentencing courts may presume that the Guidelines are reasonable or otherwise ignore the §3553(a) factors after calculating the Guidelines. See *Rita*, 551 U.S. at 351 (2007) (noting that presumption of reasonableness of Guidelines sentences "is an *appellate* court presumption" only). Rather, as the Supreme Court has made clear time and time again since *Booker*, a court's duty to consider § 3553(a)(6) does not depend on whether it ultimately imposes a Guidelines sentence, because consideration of the § 3553(a) factors is required for *every* sentence. Though the Guidelines provide a starting point,

district courts are required to impose sentences that are *individualized*, and fulfilling this duty requires a court to consider all of the § 3553(a) factors to determine if a Guidelines sentence is reasonable for the individual defendant. *Gall v. United States*, 552 U.S. 38, 50 (2007) (courts must "make an individualized assessment based on the facts presented"); <u>accord</u> *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) ("[H]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." (internal quotation marks omitted)). Moreover, even if a sentence is within the Guidelines, simply citing the Guidelines does not explain the basis for a defendant's sentence, because the Guidelines provide no information as to why the judge sentenced a defendant to a particular term (*i.e.*, the bottom, middle, or top) of the Guidelines range.

39.     *Gall* lays out a clear recognition that a within-Guidelines sentence can *create* an unwarranted disparity. *Gall* is a case study for why considering § 3553(a) factors is necessary for fair sentencing outcomes. The Fifth Circuit, as well as most other courts of appeals have recognized the import of *Gall* and the "double determination" function set forth in *Rita*. *United States v. Mondragon-Santiago*, 564 F.3d 357, 362-64 (5th Cir. 2009); <u>See also, e.g.</u> *United States v. Corsey*, 723 F.3d 366, 377 (2d Cir. 2013); *United States v. Lynn*, 592 F.3d 572, 583-84 (4th Cir. 2010); *United States v. Trujillo*, 713 F.3d 1003, 1010-11 (9th Cir. 2013).

40.     Thus, in this case, if the Court is to properly apply the double determination function, it must (1) consider that the guidelines level that applies in this case is very high, and (2) consider the fact that co-defendants, particularly Olinda Romero – a defendant with comparatively higher culpability – received a <u>significant</u> downward variance in her sentencing. Therefore, in order to avoid unwarranted sentencing disparities as laid out in § 3553(a)(6), this

Honorable Court should not only grant a variance that would bring this sentence closer to that of Olinda Romero, but also, should consider applying an even greater downward variance to account for the difference in culpability. In Romero's case, she was found to have been complicit with her husband via wiretaps, photographs, and monetary transactions showing her to have deliberately carried on these transactions with full knowledge of the criminality of her actions. Furthermore, when debriefed, Olinda Romero admitted to her full knowledge but attributed her complicity to the domestic abuse she received at the hands of her husband.

41. None of that type of evidence of complicity has been produced or collected in this case. Here, there are no recorded telephone calls that involve Ms. Figueroa. There are no video surveillances that would show Ms. Figueroa in any way, shape or form, involved in drug trafficking. Additionally, although the Government may argue *ad nauseum* that she "must have known" there simply is no evidence of it. What there is evidence of is this: Saul Romero telling an associate to deposit into his wife's account at Wells Fargo; Ms. Figueroa making payments <u>by check</u> to the builder of the home that her husband told her he was buying for her out of moneys deposited into her bank account by her husband; a photograph of Ms. Figueroa saying hello to her nieces and nephews in a public place while in the company of Nora Romero – a known accomplice in this case but also her sister-in-law. When compared to other similarly situated spouses of drug traffickers, her complicity is far from established. When one looks at the wife of Joaquin "El Chapo" Guzman, who was prosecuted in the United States for drug trafficking, money laundering, and other horrific crimes, she has not been prosecuted. And unlike Ms. Figueroa in this case, El Chapo's wife flaunts her luxurious wardrobe and other possessions. See **Ex. 30**. The truth of the matter is that when it comes to spouses of drug traffickers, the statistics in American justice is that they are rarely prosecuted. And when they

are, it is because of the abundant evidence showing a hands-on involvement with drug-trafficking husband in committing the crimes.

## MOTION FOR DOWNWARD VARIANCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) – COMPASSIONATE RELEASE

42.     Alternatively, or in addition thereto, Defendant respectfully requests an additional downward variance to permit Defendant to serve a split sentence, home confinement, or time-served in order to protect her from the spread of the novel coronavirus ("COVID-19").

43.     We are presently living in unprecedented dangerous times. The spread of the Covid-19 virus across our state and country threatens us with this unprecedented danger. We have been told by the authorities to stay home, stay safe, and not be closer than six feet from anyone. Older persons, persons with weakened immune systems and those with underlying health problems need to take ever greater precautions because of the dangerous aspects of this particular virus. Defendant hereby respectfully requests this Honorable Court to consider a substantial downward variance pursuant to 18 U.S.C. § 3582, as modified by the First Step Act. Furthermore, Defendant seeks this Honorable Court to consider the requested relief in order to protect her Eighth Amendment and Due Process rights.

44.     As of December 2018, Congress invested this Honorable Court with the power and duty to consider reducing a limited number of its previous sentences where extraordinary circumstances, not foreseen at the time of sentencing, make such reconsiderations appropriate. Now, Section 3582(c)(1)(A) of Title 18 permits a defendant to file directly with the Court a motion seeking reduction of his or her sentence for extraordinary and compelling reasons if: (1) the defendant has fully exhausted her administrative remedies; or (2) there has been a lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier. 18 U.S.C. §

3582(c)(1)(A)(i). No longer is the Court divested of jurisdiction after sentencing a defendant. Upon the proper showing and in light of extraordinary circumstances this Court is permitted to release an inmate.

45.     Accordingly, upon consideration of Defendant, Ms. Figueroa's, extraordinary and compelling showing below, Defendant asks this Honorable Court to grant a significant downward variance considering the stage of the case in which we are in – the sentencing hearing. Defendant requests, as an alternative to early release, home confinement, time-served, or otherwise, pursuant to 3582, that this Honorable Court grant a significant downward variance or impose a split sentence to account for the time that Defendant has already served.

46.     Although Defendant did plead guilty to this offense and admitted to participating in the offense with her husband, albeit unwittingly or carelessly, she is far less culpable than he is. It seems that this whole prosecution is an afterthought and the zeal with which it is being prosecuted appears more like a persecution for having been with Saul Romero for several years in Mexico evading apprehension than a prosecution based on evidence, reason and common sense.

48.     Today, each defendant, like every person in this country, is in danger of contracting a seriously aggressive and life-threatening virus. Unlike most people in this country, however, they have no way to practice the social distancing and sheltered protective measures that are mandated by governments and health officials throughout the nation and which promise some hope of surviving the consequences of infection. Indeed, Defendant, Ms. Figueroa, is prevented from such practices due to the living conditions in which she is incarcerated. She did admit to participating, albeit marginally, in a crime that led to incarceration, but the unforeseen health danger she now faces threatens her life as well as those of other inmates and BOP staff

with whom she will eventually be in close proximity. Addressing and alleviating the risk of such dangers are both prudent and compassionate without endangering others or deviating unreasonably from the intent and purpose of 3553(a) and the Sentencing Commission.

49.     It is anticipated that the Government will object to this motion based on the fact that she is not in BOP custody yet. However, this request is being made strictly as an argument under § 3553(a) as a request for a significant variance. It should be noted that Olinda Romero received a downward variance which would place Ms. Figueroa at least in the same range if this Court is to avoid unwarranted disparities in sentencing. Furthermore, Defendant respectfully requests that, not only should this Court grant a similar downward variance for her, but, even more, that her downward variance should be greater. In other words, she is less culpable in this case than Olinda Romero who physically and deliberate cooperated with her husband in his money laundering scheme.

## IV.    SENTENCING RECOMMENDATION & PRAYER

50.     Ms. Figueroa's reason for being incarcerated is a charge of conspiracy to launder money. She has no criminal background and has never had a violent disposition – a fact that has been made evident during her time in custody. She has never been involved in any sort of violence or gang-related activity. Her risk of recidivism is very low. Ms. Figueroa has never been so much as given a traffic citation, much less been arrested for a crime before. Furthermore, the offense for which is now facing sentencing is not a crime of violence or anything that could be considered collaterally associated with violence such as drug trafficking. Ms. Figueroa's conduct while in custody has been exemplary. She has never engaged in any violence or associated herself with any gang-related activity. In fact, Ms. Figueroa is physically

incapable of violence; and based on her physical and demographic background, Ms. Figueroa is not likely to ever re-offend. She is not any sort of danger to public safety. If released, she would go directly to live with her aunt and uncle who have provided for her well-being since her mother's death and have already been interviewed for purposes of pretrial release considerations.

WHEREFORE, PREMISES CONSIDERED, Defendant, Ana Figueroa, respectfully requests that this Honorable Court avoid unwarranted sentencing disparities among similarly situated defendants by granting a downward variance to **Level 17** and sentence her at the low end of 24 months to serve. Furthermore, Defendant respectfully requests that this Honorable Court split the sentence to include half of the sentence in home confinement. This sentence would be sufficient but not more than necessary to accomplish the goals of 3553(a).

Respectfully submitted,

**Martinez Law Firm P.C.**

By: */s/ Silverio Martinez*
Silverio Martinez
State Bar No. 24037040
Southern District No. 34746
1010 Juarez Ave.
Laredo, TX 78040
Tel: (956) 724-5047
Fax: (956) 284-0371
Email: smartinez@smlawfirm.net

***ATTORNEY FOR ANA FIGUEROA***

## CERTIFICATE OF CONFERENCE

I certify that I have conferred with Mrs. Graciela Lindberg, AUSA, regarding this motion on this the ___6th___ day of May, 2020, in which Mrs. Lindberg is opposed to said motion.

*/s/ Silverio Martinez*_____
Silverio Martinez

## CERTIFICATE OF SERVICE

I certify that a true and exact copy of Silverio Martinez's Response was submitted via CM/EMF Federal Filing System to Assistant United States Attorney's Office on this the 19th day of May, 2020.

*/s/ Silverio Martinez*_____
Silverio Martinez